**In re TWIN TOWERS ASSOCIATES, Debtor.**

**In re PRESIDENTIAL TOWERS LAND ASSOCIATES, Debtor.**

**Bankruptcy Nos. 77B2961, 77B2962.**

United States Bankruptcy Court, S. D. New York.

Dec. 4, 1979.

Zalkin, Rodin & Goodman, New York City for Jamaica Savings Bank.

Gelberg & Kronovet, New York City for Twin Towers.

Krause, Hirsch & Gross, New York City for Presidential Towers.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

EDWARD J. RYAN, Bankruptcy Judge.

Jamaica Savings Bank ("Jamaica"), by notice of motion dated July 27, 1979, and a supporting application with exhibits attached thereto dated that same day, moved to dismiss these Chapter XII proceedings upon the grounds, among others, that (i) it,

as the sole secured creditor having a first mortgage lien in the amount of $9,986,-213.64, had rejected the debtors' joint plan of arrangement (the "Original Plan") dated February 22, 1979, with the result that these proceedings could no longer continue and must be dismissed (the "Dismissal Motion"), and (ii) the Original Plan improperly impaired and extended Jamaica's first mortgage in contravention of Section 517 of the Bankruptcy Act, as amended (the "Act") by reason of the fact that Jamaica was a member of the Federal Home Loan Bank of New York.

The Dismissal Motion, originally returnable on August 17, 1979, was adjourned at the request of the debtors. Pending the adjourned return date, the debtors filed a joint amended plan of arrangement on August 23, 1979 (the "Amended Plan"). Shortly before the next adjourned date of the Dismissal Motion on September 19, 1979, the debtors served an answer dated September 17, 1979 in opposition thereto.

Counsel for the parties appeared before me with respect to the Dismissal Motion on September 19, 1979, October 10, 1979, October 18, 1979, November 9, 1979 and November 29, 1979. Immediately prior to the hearing on November 29, 1979, the debtors filed modifications dated November 27, 1979 to the Amended Plan.

While the Dismissal Motion was pending, Jamaica, by notice of motion dated October 2, 1979, supported by an application dated that same day with exhibits attached thereto, moved before me for an order (i) directing Dreyfuss Brothers, Inc., the Managing Agent of the debtors' real property, to turn over the Project Balance (as defined in the October 2, 1979 Application) to Jamaica, and (ii) authorizing Jamaica to apply the Project Balance, together with certain additional funds then held by Jamaica in special accounts, against accrued and unpaid interest owing to Jamaica from the debtors upon its aforementioned first mortgage (the "Turnover Motion"). The debtors filed an answer in opposition to the Turnover Motion dated October 17, 1979.

At the last hearing before me, on November 29, 1979, I deferred consideration of the Turnover Motion until I disposed of the Dismissal Motion for the reason that if I granted the Dismissal Motion, Jamaica's right to the relief requested in the Turnover Motion would follow.

On November 29, 1979, I heard Messrs. Zalkin, Rodin & Goodman, by Henry L. Goodman, Esq. and Richard S. Toder, Esq., of counsel, in support thereof, and Messrs. Gelberg & Kronovet, by Joel B. Zweibel, Esq. and Bert Weston, Esq., of counsel, in opposition thereto.

After due deliberation, I made my decision to grant the Dismissal Motion and directed that findings of fact, conclusions of law and an order be settled reflecting my decision.

I declined to hold an evidentiary hearing with respect to the Dismissal Motion, as requested by counsel for the debtors. The Amended Plan, as modified, was based upon a proposed sale of the debtors' real property through a proposed condominium conversion program. Counsel for the debtors made an offer of proof on November 29, 1979.

On December 3, 1979, debtors submitted proposed findings of fact, conclusions of law and an order. On December 5, 1979, Jamaica submitted proposed counter-findings. At the request of debtors, I held a hearing on December 12, 1979 to consider the proposed findings that had been submitted.

NOW, upon all of the aforementioned pleadings and hearings held by me thereon, the original Chapter XII petitions filed by the debtors with schedules and statements of affairs annexed thereto, and all prior proceedings heretofore had in these Chapter XII arrangement proceedings, I make the following Findings of Fact, Conclusions of Law and Order:

### FINDINGS OF FACT

1. Jamaica is a member of the Federal Home Loan Bank of New York.

2. The debtors' real property interests consist of two high-rise *rental* apartment buildings located at 1836 Metzerott Road, Adelphi, Prince George's County, Maryland (the "Premises"). The debtor Presidential Towers Land Associates ("Presidential"), is the owner and lessor of the land upon which the Premises are located. The debtor Twin Towers Associates ("Twin Towers"), is the lessee of the land and the owner of the Premises.

3. In December, 1976, Jamaica caused to be instituted in the Maryland Circuit Court for Prince George's County, a "Possession Action" and "Foreclosure Action" to foreclosure its first mortgage which burdened both the land and the Premises (collectively, the "Mortgaged Property").

4. Without delving extensively into the niceties of Maryland foreclosure law, the debtors defended the Possession Action principally upon the grounds that there was an oral forbearance agreement and that the mortgage loan was usurious. Prior to the filing by the debtors of their Chapter XII arrangement proceedings in this Court, the Maryland Circuit Court had rejected the defense of an oral forbearance agreement and, in December, 1977, was preparing to hear and determine the usury issue.

5. However, prior to the Circuit Court's hearing and determination of the usury issue, both Twin Towers and Presidential filed original petitions under Chapter XII of the Act in this Court on December 20, 1977 and both proceedings were generally referred to me.

6. Immediately after the filing of the Chapter XII proceedings, Jamaica commenced an adversary proceeding before me seeking to modify (i) the stay orders of this Court entered December 21, 1977, and (ii) Chapter XII Rule 12–43, so as to permit the continuation of the Possession and Foreclosure Actions up to the point of sale. I held hearings in connection with that adversary proceeding and entered findings of fact, conclusions of law and an order dated March 10, 1978. I concluded that the interests of justice and the convenience of the parties required that the remaining issues in the Possession Action be tried in the Maryland Circuit Court, that upon the facts

and the law this Court should not determine the usury and applicable choice of law issues involved in the Possession Action and I ordered a modification of the stay of December 21, 1977 and Chapter XII Rule 12–43, to permit the completion of the Possession Action. My March 10, 1978 order and findings of fact and conclusions of law rendered in connection therewith have become final, and are set forth in full herein.

"1. On December 20, 1977, Twin Towers and Presidential each filed petitions under the provisions of Chapter XII of the Bankruptcy Act in this Court.

"2. On December 21, 1977, orders were entered in the respective Chapter XII proceedings which, among other things, provided as follows:

'Pursuant to Rule 12–43 of the Rules of Bankruptcy procedure the filing by the debtor herein of its petition under Chapter XII of the Bankruptcy Act shall operate. as a stay of the commencement or the continuation of any court or other proceeding against the debtor, or any act or the commencement or continuation of any court proceeding to enforce any lien against the property of the debtor, including, without limitation, two proceedings in the Circuit Court for Prince George's County, Maryland entitled *LIP-CHIN, et al. v. KRONOVET, et al.*, Equity No. E–1898 and *LEBOWITZ, et al. v. TWIN TOWERS ASSOCIATES, et al.*, Equity No. E–1914.'

"3. In addition, the same orders authorized Debtors to prosecute an action entitled *Presidential Towers Land Associates and Twin Towers Associates v. Jamaica Savings Bank*, pending in the Supreme Court of the State of New York, County of New York, Index No. 07331/77 (the 'New York Usury Action').

"4. Jamaica is a mutual savings bank and is a member of the Federal Home Loan Bank of New York (Ex. 12).*

"5. Jamaica is the holder of four notes in the aggregate principal sum of $7,500,000 (the 'Notes') which are secured by deeds of trust and a consolidation and extension agreement, as amended covering certain land and improvements known as 1836 Metzerott Road, Adelphi, Maryland (the 'Property') (Exs. 2 and 3).

"6. Jamaica claims that the amount of the indebtedness owed by Twin to it is approximately $9,000,000, [Affidavits filed by Debtors pursuant to Rules XI–2 and XII–1 of the Local Bankruptcy Rules ('Rule XI–2 Affidavits') ¶ 3], while Twin concedes that the amount of its indebtedness is approximately $5,000,000 (Tr. 26 **; Rule XI–2 Affidavits ¶ 33; Application by Debtors for Prompt Determination of Amount of Debt Due Jamaica, dated February 23, 1978, ¶ 7).

"7. On or about December 22, 1976, Mark J. Lipchin and Harvey M. Lebowitz, substituted trustees appointed by deed of appointment ('Substituted Trustees'), and Jamaica instituted the Possession Action in the Maryland court, seeking an order, *inter alia*, permitting Jamaica and the Substituted Trustees to take possession of the Property, directing that all rents be paid to them and for an accounting. Saul Duff Kronovet ('Kronovet'), a general partner of Twin Towers and Presidential, RLU Realty Corp. ('RLU'), the other general partner of Presidential, and another party were named as defendants (Tr. 36–39).

"8. On or about December 29, 1976, the Substituted Trustees and Jamaica commenced the Foreclosure Action by docketing with the Clerk of the Maryland court an order pursuant to the power of sale provisions contained in the deeds of trust covering the Property together with a Statement of the Mortgage Debt (Exs. 4 and 5).

"9. The Possession and Foreclosure Action (sometimes collectively referred to hereinafter as the 'Maryland Actions') were assigned to Judge Jacob S. Levin (Ex. 6)

---

* 'Ex.' followed by a number refers to an exhibit marked in evidence by Jamaica and 'Ex.' followed by a letter refers to an exhibit in evidence by Debtors.

** All references to the transcript of trial held on March 2, 1978, are indicated by a 'Tr.' followed by the page citation.

and extensive discovery proceedings in the Possession Action commenced shortly after the filing of that action (*Ibid*).

"10. As early as April, 1977, Twin Towers asserted a defense of alleged usury in the Possession Action (Ex. 6) and this defense was contained in the demurrer and answer of defendants RLU and Kronovet filed in the Possession Action in response to plaintiffs' amended petition (Exs. 2 and 3).

"11. In the Possession Action, extension discovery proceedings were conducted by all parties with respect to the issues raised by the pleadings (Ex. 7). Thirteen persons were deposed at twenty-eight separate sessions. At the depositions, 382 exhibits were marked and the transcripts totaled in excess of 4,000 pages (Ex. 7).

"12. In addition, four sets of interrogatories were served and answered by the parties and two extensive requests for admissions of fact and genuineness of documents were filed by plaintiffs in the Possession Action and responded to by defendants therein (Exs. 7 and 9 through 10).

"13. In the Possession Action, numerous pre-trial conferences were held by Judge Levin and decisions were rendered on many motions (Exs. 6 and 7). Among other things, Judge Levin rejected Debtors' contention that the relevant documentation required that the issues be tried in the New York courts rather than in the Maryland courts (Tr. 99–100).

"14. At a pre-trial conference held in October 1977, Judge Levin determined to try the issues relating to defenses alleging an agreement by Jamaica to forbear foreclosing on the Property prior to determining the usury issue also raised by defendants (Tr. 35, 185–86).

"15. On November 14, 1977, the trial of the forbearance issues commenced before Judge Levin. The trial took ten court days and on November 30, 1977, the Court granted plaintiffs' motion to dismiss defenses based on an alleged forbearance agreement on the grounds that the defendants had failed to establish upon the facts and the law sufficient proof of the existence of such an agreement, and further that there was no meeting of the minds among the parties as to the alleged agreement (Tr. 35; Ex. 1).

"16. On November 30, 1977, Judge Levin inquired of counsel if they were ready to proceed to trial on the usury issue on December 5, 1977 (Tr. 50–51). Counsel for defendants in the Possession Action requested an adjournment (Tr. 54) and the Court inquired as to how much time would be needed to put on defendants' case. Counsel for defendants stated that he was uncertain as to whether there would be any factual testimony. (*Ibid.*) Judge Levin then stated that unless a trial was actually sought, he was prepared to decide the issue of usury on the basis of the extensive legal memoranda that had previously been submitted to the Court (Tr. 55). Counsel for plaintiffs was prepared to proceed on November 30, 1977 (Tr. 56), but counsel for defendants specifically requested a hearing and Judge Levin adjourned the trial of the usury issue to December 28, 1977 and set aside three days for the trial of the case (*Ibid.*).

"17. In connection with the usury issue, over 100 pages of legal memoranda were submitted by the parties to Judge Levin prior to November 30, 1977 (Tr. 56–57; Ex. 11).

"18. On March 2, 1978, counsel for Jamaica spoke with Judge Levin and inquired as to when the usury issue could be tried before that court if the stay was modified. Judge Levin said that he would assign the matter for trial on April 6 and 7, 1978 (Tr. 61–62).

"19. In late December, 1976, Debtors commenced an action against Jamaica, and other parties in the Supreme Court of the State of New York, County of New York, Index No. 23585/76 (the 'Interference Action') seeking (i) damages of $1,000,000 based upon alleged tortious interference by Jamaica and others with Debtors' relationship with its managing agent for the Property, and (ii) to enjoin Jamaica from proceeding in the Maryland courts (Tr. 137–38).

"20. Almost immediately after commencement of the Interference Action,

Debtors moved for a preliminary injunction to enjoin further proceedings in the Maryland courts (Tr. 138). In support of that motion, Debtors argued that the parties had agreed in the mortgage documentation that all proceedings with respect to the Property would be conducted in the New York courts. In a decision dated January 5, 1977, Justice Hilda G. Schwartz rejected Debtors' argument and denied the motion for a preliminary injunction (Ex. 13). Subsequent to Justice Schwartz's decision, there have been almost no further proceedings had in the Interference Action (Tr. 139).

"21. On or about April 22, 1977, Debtors instituted the New York Usury Action against Jamaica, seeking, *inter alia*, to recover interest paid to Jamaica in connection with the obligation owed by Twin to Jamaica on the ground that the interest rate charged was allegedly usurious (Tr. 138–40).

"22. Subsequently, in the New York Usury Action, Debtors moved for partial summary judgment on the ground that the interest rate charged was usurious. Jamaica cross moved for summary judgment dismissing the complaint (Tr. 140; Ex. 14). On October 21, 1977, Justice Alfred M. Ascione denied both motions finding, *inter alia*, that there were factual issues which would have to be resolved at trial. Among these issues was whether the parties intended the laws of Maryland or New York to govern the interest rate charged (Ex. 14). Both parties appealed from Mr. Justice Ascione's decision but the appeals have not been prosecuted (Tr. 141).

"23. No discovery proceedings have been conducted by the parties in connection with the New York Usury Action (Tr. 154).

"24. The New York Usury Action and the Interference Action have not been consolidated although each arises from the same underlying facts (Tr. 158).

"25. On January 31, 1978, counsel for Debtors filed a note of issue and statement of readiness in the New York Usury Action. A motion to strike the note of issue and statement of readiness was made by Jamaica (Ex. B) and was disposed of by permitting the action to remain on the calendar while giving Jamaica 90 days to complete discovery (Tr. 141–142).

"26. Counsel for Jamaica in the New York Usury Action has not as yet reviewed the voluminous discovery taken in the Possession Action and until that has been done, he will not be in a position to determine whether additional discovery will be necessary (Tr. 154–55).

"27. The New York Usury Action has been placed on the commercial, non-jury calendar (Tr. 142–43) and the Clerk of the court has advised counsel for Jamaica that the case will not be reached for conference and assignment to a trial part for at least ten months. After the action has been assigned to a trial part, that judge will determine when the case will actually be tried (Tr. 143). It is not possible to readily predict when a case assigned to a trial part will actually be tried (Tr. 143–44, 148, 152–53).

"28. A trial in the Possession Action can be had much sooner than a trial in either the New York Usury Action or the Bankruptcy Court (Tr. 131–33).

"29. Debtors argued, *inter alia*, that they would be unable to obtain a fair trial on the usury issue before Judge Levin in the Possession Action (Tr. 179–84). Although it seemed inappropriate to explore the issue in the state of the pleadings, I accepted evidence with respect to Debtors' contention. I have concluded that Debtors have failed to demonstrate their inability to obtain a fair trial before Judge Levin on the usury issue and in connection therewith I make the following findings:

"(a) Judge Levin has made no judicial determination with respect to whether usury is a valid defense (Tr. 92, 179–80).

"(b) Counsel for Debtors conceded that Judge Levin was not prejudiced against them (Tr. 184) and that they had a fair trial before Judge Levin on the forebearance issue (Tr. 185).

"(c) Debtors' contention that Judge Levin has 'prejudged', 'had no appreciation of' and 'indicated no interest in' the usury issue (Tr. 184) appears to be based pri-

marily on an apparently casual remark made by the Court in a conference questioning whether a defense of usury could be asserted where interests had been paid by these sophisticated borrowers for five and a half years (Tr. 179–80).

"(d) While the remark was allegedly made by Judge Levin in April, 1977 (Tr. 177–80, 188–89; Ex. 2; Finding of Fact 10), no motion to disqualify Judge Levin was ever made by Debtors (Tr. 118, 189–90) and they did not object to Judge Levin trying a related issue in the Possession Action in November, 1977.

"(e) A reading of the relevant pages of the transcript of proceedings before the Maryland court on November 30, 1977 (Ex. 15) reveals that all parties were routinely preparing for the trial of the usury issue to be commenced on December 28, 1977 (Tr. 199–200; Ex. 15).

"30. The New York Usury Action was filed by Debtors as a counter to the litigations already pending in the Maryland court (Tr. 260).

"31. The Chapter XII petitions were filed solely for the purpose of preventing the Maryland court from trying and rendering a decision with respect to the remaining issues in the Possession Action (Tr. 204–05, 260–61). Debtors' 'forum shopping' is further demonstrated by their obtaining orders from the Bankruptcy Court explicitly staying the Maryland Actions while at the same time obtaining authority to prosecute the New York Usury Action (Findings of Fact 2 and 3).

"32. On or about February 22, 1978, Debtors filed Plans whereby, *inter alia*, Debtors agreed to pay Jamaica within 120 days after confirmation, in cash, the full amount of its debt 'as finally determined (after all appeals) in this Chapter XII proceeding, including such interest as may be determined by this Court for the 120-day period after confirmation.' In addition, Debtors have moved for a determination of the amount of debt due Jamaica.

"33. The determination of the issues currently before Judge Levin will assist the Bankruptcy Court in the resolution of issues that will have to be determined in the Chapter XII proceedings.

"34. In the course of the extended and extensive proceedings already had in the Possession Action, Judge Levin has become fully familiar with the entire background of the highly complicated and voluminous real estate transactions between the parties and, in addition, has already had presented to him, extensive memoranda of law on the usury issue (Tr. 44, 71–72, 106–07; Exs. 6 through 11).

"35. Judicial economy will be furthered by a prompt determination by the Maryland court of the remaining issue in the Possession Action since that court is already knowledgeable with respect to the related issues (Tr. 58, 115, 209).

"36. Debtors have failed to demonstrate any harm resulting from a modification of the stay so as to permit the Maryland court to try the remaining issues in the Possession Action. On the contrary, the convenience of the parties will be served by an early adjudication by the Maryland court of these issues.

## CONCLUSIONS OF LAW

"A. The interests of justice and the convenience of the parties require that the remaining issues in the Possession Action be tried in the Maryland Court.

"B. Upon both the facts and law, the Bankruptcy Court should not determine issues of usury and applicable state law raised by affirmative defenses contained in answers to complaints seeking modification of this Court's orders and Chapter XII Rule 12–43 so as to permit the continuation of pending State court litigation.

"C. Debtors have failed to sustain their burden of proving that they are entitled to continuation of the stays provided by this Court's orders and Chapter XII Rule 12–43.

"D. As a matter of discretion, this Court's orders of December 21, 1977 entered in the respective Chapter XII proceedings and Chapter XII Rule 12–43, should be modified to permit the continuation of the Possession Action."

7. While the adversary proceeding was pending, the debtors filed the Original Plan which proposed to pay Jamaica within 120 days after confirmation, in cash, the full amount of its debt, "as finally determined (after all appeals) in this Chapter XII proceeding, including such interest as may be determined by this Court for the 120-day period after confirmation."

8. On May 4, 1979, the Circuit Court for Prince George's County, Maryland, issued a decree in the Possession and Foreclosure Actions containing findings of fact, conclusions of law and an order (the "Decree"), an exemplified copy of which was attached to Jamaica's Dismissal Motion as Exhibit 4. The Circuit Court's Decree overruled and dismissed the defense of alleged usury, granted a permanent order of possession with respect to the Mortgaged Property to the trustees under Jamaica's mortgage, dissolved the stay of the Foreclosure Action, found that Jamaica had a valid, subsisting first mortgage lien upon the Mortgaged Property and calculated that the total mortgage debt owing to Jamaica at January 1, 1979 was $9,986,213.64 with a per diem interest from and after January 1, 1979 of $1,735,697.

9. The debtors have appealed the May 4, 1979 Decree to a Maryland intermediate appellate court.

10. The Amended Plan filed by the debtors while the Dismissal Motion was pending proposed to pay the amount of the mortgage debt to Jamaica, fixed in the Decree, within eight months *after* an order was entered confirming their Amended Plan by establishing a fund, to be created through a sale of the entire Mortgaged Property through a condominium conversion program, which would commence on the day the confirmation order became final. The Amended Plan also provided that while the funds necessary to pay the mortgage debt to Jamaica had to be "established" within eight months from the finality of a confirmation order, the mortgage debt would not be paid to Jamaica, until a "final determination as to the amount of the Jamaica mortgage indebtedness . . ."

11. The modifications dated November 27, 1979 to the Amended Plan altered the Amended Plan, to provide for payment of Jamaica's mortgage debt not later than eight months after the finality of a confirmation order, or earlier, if 51% of the apartments were contracted to be sold through the condominium conversion program and an interim or "gap" mortgage loan was made.

12. The debt structure of the debtors was revealed by their schedules filed with their Chapter XII petitions. With respect to Twin Towers, Jamaica was scheduled as holding a first mortgage on the Mortgaged Property in a disputed amount of approximately $9,000,000, and Atlantic Continental Corp. ("Atlantic") was scheduled as holding a second mortgage on the Mortgaged Property in the approximate amount of $43,000. Chemical Bank was scheduled as having a claim of $133,813, secured by a lien on the proceeds of a claim against an insurance company. I find that there are only two real property liens to be dealt with in Twin Towers' arrangement proceeding, namely, Jamaica's first mortgage lien and the Atlantic second mortgage in the amount of approximately $43,000. The schedules further represented that Twin Towers' unsecured debts aggregated $1,046,668. According to its schedules, Twin Towers' largest unsecured creditor was Presidential, for accumulated lease payments in the approximate aggregate amount of $650,000 owing since July, 1971. The Chemical Bank loan was also scheduled by Twin Towers as an unsecured debt. Apart from those two debts, approximately $280,719 of debts consisted of legal fees owing to four sets of attorneys, two of which are located in New York and the other two being located respectively in Washington, D. C. and Baltimore, Maryland. The sole assets claimed in Twin Towers' schedules consist of its leasehold interest in the land and its ownership of the rental apartment buildings, the value of which was described in Schedule B–1 as "to be established," and four law suits, two of which are law suits against Jamaica, one

of which is the law suit against an insurance company upon which Chemical Bank has the reported limited lien: the fourth is a law suit against Alexander Grant & Company, an accounting firm, for damages by reason of reliance upon certifications of false financial statements.

13. Twin Towers is a limited partnership. Its sole general partner, Saul Duff Kronovet, was, at the time the Chapter XII petition was filed, a general partner of the New York City law firm of Kaye, Scholer, Fierman, Hays & Handler. The limited partners consist of a variety of individuals and entities including an entity described as "Kaye 1969 Associates, c/o Saul Duff Kronovet, 425 Park Avenue, New York, New York 10022."

14. The second mortgage held by Atlantic was purchased by the limited partners of the debtors *after* the Chapter XII proceedings were filed. They filed an acceptance of the Original Plan, as assignee of Atlantic, executed by Mr. Kronovet, on or about April 13, 1978 and also filed an acceptance of the Amended Plan on or about November 29, 1979. They included in their November 29, 1979 acceptance of *the Amended Plan* a statement to the effect that that second mortgage had in fact been purchased by them. The statement is as follows:

> "The original mortgage and claim of Atlantic was purchased by and assigned to the undersigned by Atlantic in consideration for the payment by the undersigned to Atlantic of the entire unpaid face amount of such mortgage claim."

I find that upon the post-petition purchase of the Atlantic second mortgage by the debtors' limited partners, they had the ability of satisfying that second mortgage of record, but chose not to do so to continue a multiple secured creditor class to overcome Jamaica's legal position. However, because of the inferior rank of the second mortgage, its amount when compared to the amount of Jamaica's first mortgage, the identification of the limited partners of the debtors with the debtors and the fact that the present market value of the Mortgaged Property is approximately $7,000,000 (substantially less than Jamaica's *first* mortgage debt, I decline to count the "acceptance" of the Amended Plan by the limited partners holding the second mortgage, or to consider that there is any real property lienor having an economic interest in these proceedings other than Jamaica.

15. The debtor Presidential, as previously noted, is the owner of the land upon which the Premises are located and is the lessor and leases the same to Twin Towers. According to the statement of affairs attached to Presidential's schedules, Mr. Kronovet and RLU Realty Corp., whose address is stated as c/o Saul Duff Kronovet, 425 Park Avenue, New York, New York 10022, are the two general partners. Kaye 1969 Associates is one of a number of limited partners of Presidential. Presidential's schedules reflect the first mortgage held by Jamaica in the approximate amount of $9,000,000, the second mortgage held by Atlantic in the approximate amount of $43,000 and the four law firms who were scheduled as unsecured creditors of Twin Towers as having claims for legal services rendered in amounts "to be determined." The sole assets are the fee interest of Presidential in the land, scheduled in an amount "to be established," rent due from Twin Towers in the approximate amount of $650,000 and a law suit against Jamaica for recovery of interest paid by reason of an allegedly usurious first mortgage lien "in an amount to be determined."

16. At the hearing held before me on November 29, 1979, counsel for the debtors made an offer of proof, as follows:

> "MR. ZWEIBEL: I would like to make an offer of proof for the record in connection with the record that will go up on appeal and it will be simply as follows: that the value of this property is $15.5 million, that the provisions of the plan which provide for payment to Jamaica in not less than eight months and earlier if 51 percent of the units are sold is feasible, that the property if sold at a forced sale would realize substantially less than the $15.5 million; indeed, undoubtedly

not more than the amount of the Jamaica mortgage indebtedness.

In addition, the offer of proof would be that the second mortgage was originally made by the partnership to Atlantic Continental Corp., an entity entirely unaffiliated with the debtor or its limited partners, in an original principal amount of approximately $400,000.

THE COURT: Mr. Zweibel, I don't want to interrupt you, and I see where you are going. I will call upon Mr. Goodman.

Mr. Goodman, without conceding relevancy, I assume that you will sit down with Mr. Zweibel and anything that there is no question he can prove, you will accept for purposes of our findings and conclusions. I don't refer to the earlier matters. For instance, say the property is worth $15.5 million. Today, after conversion or what? I mean, it's critical. I mean, it can be critical.

MR. ZWEIBEL: Our offer of proof, to be specific, is the property is worth $15.5 million at a minimum after conversion, that the value as a rental project today on a fair market value basis is no more than $7 million and on a forced sale basis would be less than that, in addition to which the offer of proof would be that the 51 percent of the apartment units could be sold within four to five months, so that payment to Jamaica would be made by approximately April of 1978.

Finally, the offer would include a statement that the property is in good condition, it is not deteriorating in value; it is being maintained, and that all provisions of the plan can be complied with. The reason I make that offer of proof, your Honor, is I think it is important for the record, and with due deference to your suggestion, the history of our ability to get together on stipulations has not been productive in the past. (Transcript of Hearing held 11/29/79, pp. 17–19)

17. In conclusion, I find on the basis of all of the foregoing that:

(a) Jamaica is for purposes of this motion the sole secured creditor of the debtors holding a first mortgage which has been determined by the Decree mentioned in paragraph 8, *supra*, to be a valid and subsisting lien upon the Mortgaged Property to secure an indebtedness due from the debtors in the amount of $9,784,642.12 at January 1, 1979; the accrued and unpaid interest from January 1, 1979 through November 30, 1979 amounts to $579,722.79 (334 days times the per diem rate established by the Maryland Decree of $1,735,697), so that at November 30, 1979, the aggregate indebtedness due from the debtors to Jamaica is $10,364,364.91 pursuant to the same Decree.

(b) Chemical Bank does not hold a debt secured by real property or a chattel real of which the debtor is the legal or equitable owner.

(c) The $43,000 second mortgage must be disregarded for the reasons stated in Finding 14, and for the additional reason that even if that second lien were of equal rank with Jamaica, it would represent but four one thousandths (.004) of the real property liens $(43,000 \div (10,364,364 + 43,000))$.

(d) Jamaica, as the sole secured creditor of the debtors, has rejected the Plans and all amended and modified versions thereof put forth by the debtors, and has steadfastly represented that it will never accept any plan which might be proposed by the debtors. In any event, it is plain that the Amended Plan and its modified version require a condominium conversion program in order to reach claimed value of approximately $15½ million.

CONCLUSIONS OF LAW

■ A. Jamaica is the sole secured creditor of the debtors. The overwhelming weight of authority requires the dismissal of these Chapter XII proceedings as Jamaica has rejected all Plans. Among the many cases so holding are *Kunze v. Prudential Insurance Company*, 106 F.2d 917 (5th Cir. 1939); *In re Herweg*, 119 F.2d 941 (7th Cir. 1941); *Meyer v. Rowen*, 195 F.2d 263 (10th Cir. 1952); *Taylor v. Wood*, 458 F.2d 15 (9th Cir. 1972); *In re Gardens of Cortez*, 585

F.2d 975 (10th Cir. 1978); *In re Perimeter Park Investment Associates, Ltd.*, 5 Bankr. Ct.Dec. 730 (N.D.Ga.1979); *In re Schwab Adams Company*, 463 F.Supp. 8 (S.D.N.Y. 1978); *In re Spicewood Associates*, 445 F.Supp. 564 (N.D.Ill.1977); *In re Village I Apartments Associates*, —— Bankr.Ct.Dec. ——, 79 Bk. 807 (N.D.N.Y. 10/25/79, Mahoney, B. J.); *In re Stillbar Construction Co.*, 4 Bankr.Ct.Dec. 452, *aff'd.* Bankr. Ct.Dec. 1110 (N.D.Ga.1978).

B. There are no relevant and material issues of fact which require an evidentiary hearing in determining Jamaica's Dismissal Motion.

C. In light of the authorities, I am neither required nor do I believe it appropriate to hold an evidentiary hearing with respect to a proposed condominium conversion program for this rental apartment project. Jamaica, the sole secured mortgagee of the debtors, cannot be compelled, against its will, to finance the debtors' attempt to realize alleged values through a condominium conversion program.

NOW, on motion of Zalkin, Rodin & Goodman, attorneys for Jamaica, it is hereby

ORDERED, that the Chapter XII proceedings of Twin Towers Associates and Presidential Towers Land Associates be and the same are hereby dismissed, with prejudice, and it is further

ORDERED, that the debtors' request for a stay of this order pending the determination of an appeal to be taken therefrom is granted.